**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
MARTINSBURG**

**THE TRUTH TELLERS, LLC,**

Appellant,

**v.**                                           **CIVIL ACTION NO.: 3:22-CV-66
(GROH)**

**DAVID A. LEVINE,**

Appellee.

<u>**MEMORANDUM OPINION AND ORDER AFFIRMING BANKRUPTCY COURT**</u>

The Truth Tellers, LLC, appeals from the Memorandum Opinion and Order of the United States Bankruptcy Court for the Northern District of West Virginia entered on March 31, 2022, docketed in 3:20-ap-36. ECF No. 1. Therein, the bankruptcy court denied the relief sought by the Truth Tellers in its adversary complaint, finding that the disputed transfers were dischargeable in the underlying bankruptcy proceeding. Upon review and consideration of the parties' briefs and joint appendix, the record, and pertinent case law, the Court finds that the facts and legal arguments are adequately presented, and the decisional process would not be significantly aided by oral argument. Thus, a hearing is unnecessary in this matter. Fed. R. Bankr. P. 8013(c), 8019(b)(3). For the reasons that follow, the bankruptcy court's decision is **AFFIRMED**.

**I.  Background[1]**

**A.  Factual Background**

Two individuals lie at the heart of this case: Anne Meador and David Levine. In

---

[1] The facts recited are taken from the parties' briefs, joint appendix, and the designated record on appeal.

September 2018, the two met at a Jefferson County Development Authority meeting, which focused on the planned Rockwool factory installation. Ms. Meador and Mr. Levine remained in touch over the next year, seeing each other at meetings and protests. Nearly a year later, in the beginning of August 2019, their relationship evolved from platonic and casual to romantic and intimate.[2] Nearly immediately after the blossoming of their physical relationship, the pair became business partners as well.

Later that month, Ms. Meador and Mr. Levine met with an attorney to form The Truth Tellers, LLC. During their meeting, Mr. Levine suggested that the attorney create the LLC in Ms. Meador's name. Ms. Meador became the President and sole Member of Truth Tellers, while Mr. Levine became Secretary. Mr. Levine requested that the attorney draft an operating agreement for the LLC, but the agreement was not completed.

On August 30, 2019, Ms. Meador opened a bank account for Truth Tellers, and Mr. Levine was a signatory on the account. Both Ms. Meador and Mr. Levine had authority to open, close, and conduct business on the account. Additionally, both Ms. Meador and Mr. Levine completed signature cards for the account. They used a building owned by Mr. Levine as the mailing address for the bank statements, and the pair planned to use that building as the corporate office for Truth Tellers.

The bank account for Truth Tellers was also linked with two other business accounts, one for Indeco Union[3] and one for Climate Pictures[4]. As President of Climate Pictures, Ms. Meador accessed its online bank account regularly. She organized payroll

---

[2] Mr. Levine was married to another woman, Monica Levine, at this time.
[3] Indeco Union is another company of Mr. Levine's. He created the company in 2017 with another individual as a public benefit corporation hoping to finance solar energy and green infrastructure projects using security token offerings on blockchain.
[4] Climate Pictures is a nonprofit organization created by Mr. Levine in order to film a documentary about Rockwool. Mr. Levine had previously hired Ms. Meador as President of Climate Pictures.

and health insurance for Climate Pictures and generally reviewed the organization's finances to ensure its debits were covered.

Shortly after opening the bank account for Truth Tellers, Ms. Meador deposited $50,000.00 into the account. First, she deposited $20,000.00 by wire transfer on September 6, 2019, and then an additional $30,000.00 by wire transfer on September 16, 2019. Around this time, Mr. Levine was in a precarious financial state, so much so that he was considering filing for bankruptcy protection. Ms. Meador was aware of Mr. Levine's financial condition when they established Truth Tellers together and opened its bank account.

Throughout the month of September, Mr. Levine made repeated withdrawals ("disputed transfers") from Truth Tellers's bank account. First, on September 6, 2019, the same day that Ms. Meador deposited $20,000.00 into the account, Mr. Levine transferred $19,000.00 via check to his personal bank account that he shared with his wife, Monica Levine. Mr. Levine used $16,400.00 of this transfer to pay his mortgage servicer, Specialized Loan Servicing. He deposited the remaining $2,599.00 into his personal bank account. A week later, on September 13, 2019, Mr. Levine transferred $700 from Truth Tellers's account to the checking account of ThreeSquare, LLC.[5] On September 18, 2019, two days after Ms. Meador deposited an additional $30,000.00 into Truth Tellers's account, Mr. Levine transferred $15,000.00 from Truth Tellers's account into Indeco's checking account. Mr. Levine's final transfer occurred on September 20, 2019, when he transferred $15,250.00 to Indeco's checking account.

Mr. and Mrs. Levine filed a Chapter 13 bankruptcy petition just three months later,

---

[5] ThreeSquare is a real estate holding company established by Mr. and Mrs. Levine in 2002.

on December 13, 2019.[6] Initially, the Levines did not list Truth Tellers as a creditor in their bankruptcy schedule. Even so, Truth Tellers still received service of the Levines's bankruptcy proceeding and timely filed a proof of claim.

On February 3, 2020, Ms. Meador signed a convertible note, on behalf of Truth Tellers, from Indeco. The note provided that, on the closing date, Truth Tellers would invest $161,500.00, with $86,500.00 being new cash, while the remaining $75,000.00 referred to cash invested previously: $20,000.00 on August 30, 2019[7], $30,000.00 on September 16, 2019, and $25,000.00 on November 29, 2019. The note provided for repayment of the money invested with interest at the time of maturity or for conversion into preferred stock in Indeco upon a qualified financing. At this time, Indeco had no employees on payroll and was pivoting to a new business focus. However, Indeco had received money for two offerings, a website named Crypto Launch and consulting agreements, and possessed the following technology: an application, a "tech stack," an analytics engine, code on a block chain, and the Crypto Launch website. Mr. Levine signed the convertible note on behalf of Indeco.

A month later, March 2020, Mr. Levine ended the romantic relationship between he and Ms. Meador through email. Around this same time, Ms. Meador realized that she could not access Truth Tellers's online banking account, but she could still access the other linked accounts. Ms. Meador asserted that, although she had made transfers into Truth Tellers's account after the $50,000.00 in September 2019, when she reviewed the account in March 2020, she still expected to see her $50,000.00 in the account because

---

[6] Their case was later converted to a Chapter 7 proceeding.
[7] The Court notes that the initial transfer occurred on September 6, 2019. Truth Tellers's bank account was opened on August 30, 2019. The date on the convertible note was likely a typographical error.

the funds were intended for the documentary, which had yet to come to fruition. When she visited the bank in person, she discovered the funds were no longer there. About six months later, the underlying adversary proceeding ensued.

### B. Procedural Background

#### i. Underlying Bankruptcy Proceeding

Mr. Levine and his wife, Monica Levine, filed a voluntary petition for bankruptcy pursuant to Chapter 13 of the bankruptcy code on December 13, 2019, which was docketed as 3:19-bk-1048. The bankruptcy court later converted the Levines' bankruptcy to a Chapter 7 proceeding. The Truth Tellers filed an adversary proceeding related to the Levines' bankruptcy on September 8, 2020.

In its complaint, Truth Tellers alleged that Mr. Levine improperly withdrew $49,950.00 from its bank account. Truth Tellers argued that Mr. Levine's liability to repay the $49,950.00 was non-dischargeable pursuant to 11 U.S.C. § 523(a)(3), based on Mr. Levine's failure to schedule the disputed transfers, and pursuant to 11 U.S.C. § 523(a)(4), based on Mr. Levine's alleged fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. On October 9, 2020, Mr. Levine answered the complaint and amended his bankruptcy schedules to include Truth Tellers's claims.

The bankruptcy court held a two-day bench trial to adjudicate the adversary proceeding between Truth Tellers and Mr. Levine, from September 23, 2021, to September 24, 2021, in Clarksburg, West Virginia.[8] At trial, neither party contested that Mr. Levine was a fiduciary of Truth Tellers, that he withdrew $49,950.00 from Truth Tellers's bank account, or that these funds were not used to advance any legitimate

---

[8] Before trial, the bankruptcy judge granted each party's motion to permit certain witnesses to testify remotely.

business purpose of Truth Tellers. The central issue the bankruptcy court needed to decide at trial was whether Mr. Levine committed defalcation, fraud, or embezzlement through his execution of the disputed transfers. If so, then the disputed transfers should be declared nondischargeable in Mr. Levine's bankruptcy proceeding.

At the heart of this issue is whether Mr. Levine withdrew the disputed transfers and used the funds with or without Ms. Meador's knowledge and authorization. Mr. Levine testified that Ms. Meador both had knowledge of and consented to the disputed transfers. Mr. Levine alleged that Ms. Meador initially offered to give him a personal loan, but he claimed he suggested that she deposit the money into a company that she owned instead. Mr. Levine explained that they structured the deposit in this way to increase Ms. Meador's chance of being repaid because both Ms. Meador and Mr. Levine knew it was quite likely that a bankruptcy loomed in Mr. Levine's future.

Ms. Meador testified that she did not know of and did not consent to the disputed transfers. She claimed she did not discover that Mr. Levine had executed the disputed transfers until March 2020, after their relationship had ended and after she lost online access to the bank account. Ms. Meador asserted that she only learned about the disputed transfers after visiting the bank in person. Ms. Meador did not produce any evidence besides her testimony at trial to support her argument.

Near the conclusion of trial, during its rebuttal argument, Truth Tellers moved to admit into evidence two deposition transcripts: the transcript of Vladimir Tereshkov's deposition held on February 8, 2021, and the transcript of Aparna Sundaram's deposition held on February 11, 2021. Mr. Levine objected and argued that the transcripts constituted hearsay, that Truth Tellers failed to show that the witnesses were more than

one hundred miles from the court, and that the court had discretion to exclude the transcripts. In response, Truth Tellers asserted that both witnesses resided more than one hundred miles from the court, a fact reflected in their testimony during the deposition.[9] Further, Truth Tellers argued that, because the bankruptcy court admitted an unsworn transcript of a Zoom meeting submitted by Mr. Levine, it would be categorically unfair to exclude the depositions of Mr. Tereshkov and Ms. Sundaram.

After a brief recess to consider the parties' arguments, the bankruptcy judge returned and denied Truth Tellers's motion to admit the depositions. First, the bankruptcy court found that the deposition transcripts are subject to hearsay rules. Second, the court held that Truth Tellers bears the burden of proving that the depositions are admissible under Rule 32 of the Federal Rules of Civil Procedure. The bankruptcy court noted that "the mere fact that a party is more than a hundred miles from the courthouse does not require the court to automatically admit a party's deposition." ECF No. 5-3 at 278. The court further noted that it made accommodations for the two deposed witness to appear remotely, by videoconference or telephone, after motion by Truth Tellers. Ultimately, the Court excluded the deposition transcripts, find that Truth Tellers did not satisfy its burden of proving that the witnesses were unavailable and the depositions constituted hearsay.

Shortly after trial concluded, Truth Tellers filed a motion to reconsider, asking the bankruptcy court to reconsider its ruling excluding the deposition transcripts. In its motion, Truth Tellers reasserted the same arguments initially presented at trial. Truth Tellers emphasized that the deposed witnesses objectively resided more than one hundred miles

---

[9] Mr. Tereshkov resides in Leesburg, Virginia, and Ms. Sundaram resides in Brooklyn, New York. Leesburg, Virginia is over two hundred miles from the courthouse, and Brooklyn, New York is over four hundred miles from the courthouse.

from the court, placing them outside the court's compulsion authority. Truth Tellers claimed no procedure or authority existed to compel a witness to appear remotely. Truth Tellers again focused on the court's earlier admission of Mr. Levine's Zoom transcript and asserted that "[a]t the very least, the even-handed administration of justice requires these transcripts to be admitted." ECF No. 5-1 at 4.

On December 9, 2021, the bankruptcy court denied Truth Tellers's motion for reconsideration, largely on the same grounds the court applied when excluding the deposition transcripts at trial. The court again explained that federal courts are not automatically required to admit deposition testimonies under Rule 32(a)(4)(B) just because the witness is more than one hundred miles away. Instead, courts may consider several other factors: the circumstances relating to the witness's absence, the surprise to opposing counsel, other evidentiary rules, and the longstanding preference of federal courts to have live testimony over recorded testimony.

First, regarding evidentiary concerns, the court stated that Truth Tellers requested to admit the entire deposition transcripts without explaining the relevance of the testimony. Noting that courts often find it inappropriate to admit entire deposition transcripts, the bankruptcy court declined to admit the two full transcripts of Mr. Tereshkov's and Ms. Sundaram's depositions upon finding that Truth Tellers failed to show their relevance under Rules 401 and 402 of the Federal Rules of Evidence.

Next, the bankruptcy court explained that the purpose behind Rule 32 of the Federal Rules of Civil Procedure is to ease the convenience of the witnesses and parties at trial. Upon motion of Truth Tellers, the court arranged accommodations to allow Mr. Tereshkov and Ms. Sundaram to participate in and testify at trial through either

videoconference or telephone. The court provided this accommodation to both parties and found it unreasonable to allow Truth Tellers to change course on the day of trial without explaining why its witnesses have become unable to attend or showing that the witnesses' failure to attend was not voluntary. The court further found that admitting the transcripts at the last minute would result in unfair surprise to Mr. Levine and deprive him of an opportunity to cross-examine the witnesses as they were scheduled to appear.

Lastly, the bankruptcy court was not convinced that "the even-handed administration of justice" required the admission of the deposition transcripts based on the earlier admission of a Zoom transcript by Mr. Levine. The bankruptcy court explained that the Zoom transcript was admitted for a nonhearsay purpose. Indeed, during trial, when overruling Truth Tellers's objection, the bankruptcy court specifically stated, "I do want to say the exhibit is being admitted, but Mr. Campbell, I hope that you trust that the Court is aware enough of the exhibit and what it's being offered for to afford it the necessary relevance when making its opinion . . . or when deciding the outcome of the case." ECF No. 5-3 at 110. Moreover, Truth Tellers had previously agreed to admit two pages of the Zoom transcript as an admission against interest. In denying the motion to reconsider, the bankruptcy court found the Zoom transcript could not be accurately analogized to the deposition transcripts because the Zoom transcript was relevant, was at least partially admitted to by Truth Tellers, and, most notably, was admitted for purposes other than for the truth of the matter asserted.

On March 31, 2022, the bankruptcy court entered its Memorandum Opinion and Order, denying the relief sought in Truth Tellers's Adversary Complaint. The bankruptcy court ruled that Mr. Levine's debt arising from the disputed transfers did not qualify as

non-dischargeable pursuant to either 11 U.S.C. § 523(a)(3), for failing to schedule the Truth Tellers's debts, or § 523(a)(4), for committing frauds or defalcations while acting in a fiduciary capacity, embezzling the disputed transfers, or committing larceny with respect to the disputed transfers. Because neither party disputed Mr. Levine's fiduciary status, the bankruptcy court focused its analysis on whether Mr. Levine committed defalcation, embezzlement, or fraud.

To determine whether Mr. Levine committed defalcations, the dispositive question for the bankruptcy court to resolve was whether Ms. Meador, as the sole Member and President of Truth Tellers, knew of and consented to the disputed transfers made by Mr. Levine from Truth Tellers's bank account. The bankruptcy court noted glaring inconsistencies in Ms. Meador's testimony and ultimately found her testimony far less credible than Mr. Levine's. The bankruptcy court detailed how Ms. Meador's testimony flip flopped at different times. Piecing together the threads of Ms. Meador's testimony, the court found that the only logical result of her statements is that she noticed a change in the electronic access to the bank account in February 2020 because she had been able to electronically monitor the account before February 2020, including during the time when the disputed transfers occurred.

While counsel for Truth Tellers sought to characterize Ms. Meador as a naïve bystander, someone who was unfamiliar with and unsophisticated in business transactions and financial matters, the court found that the evidence before it demonstrated otherwise. Prior to meeting Mr. Levine, Ms. Meador held multiple roles involving business organization and financial literacy. Once she became intertwined in business ventures with Mr. Levine, her employment similarly involved financial matters

and decisional oversight. Given her prior experience and subsequent roles in Climate Pictures and Truth Tellers, the bankruptcy court found that Ms. Meador, as the sole Member and President of the Truth Tellers, was aware of the disputed transfers.

Additionally, the bankruptcy court noted that at no point did Ms. Meador ever object to Mr. Levine's use of the funds from the disputed transfers or demand repayment until after their romantic relationship ended. Citing the doctrine of ratification, the bankruptcy court held that even if Ms. Meador did not explicitly approve the disputed transfers, her silence for over six months ratified the disputed transfers. The bankruptcy court further concluded that the lack of any evidence showing Ms. Meador's disapproval of the disputed transfers supported Mr. Levine's testimony that the disputed transfers were made with Ms. Meador's knowledge and consent during her tenure as Member and President of Truth Tellers.

Ultimately, the bankruptcy court found that Ms. Meador was indeed aware of the disputed transfers, and Truth Tellers failed to prove by a preponderance of the evidence that the disputed transfers constitute defalcation. Because both fraud and embezzlement have more stringent standards than defalcation, the bankruptcy court found that Mr. Levine did not execute the disputed transfers through fraud or embezzlement. Accordingly, the bankruptcy court ruled that the debt incurred from the disputed transfers was dischargeable in Mr. Levine's bankruptcy and denied the relief sought in Truth Tellers's adversary complaint.

### ii. Instant Appeal

Truth Tellers (hereinafter "Appellant") appeals from the Memorandum Opinion and Order of the United States Bankruptcy Court for the Northern District of West Virginia

entered on March 31, 2022, which denied the relief sought in their adversary complaint. The Appellant filed its Brief on June 16, 2022, [ECF No. 7] and Mr. Levine (hereinafter "Appellee") submitted his Brief on July 18, 2022, [ECF No. 8]. The Appellant timely entered its Reply Brief on August 1, 2022. ECF No. 9. Accordingly, this matter is now ripe for adjudication.

## II.  Jurisdiction

District courts have jurisdiction to hear appeals "from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157." 28 U.S.C. § 158(a). To be "final," an order must "resolve the litigation, decide the merits, settle liability, establish damages, or determine the rights" of a party to the bankruptcy case. In re Looney, 823 F.2d 788, 790 (4th Cir. 1987). The district court "may affirm, modify, or reverse a bankruptcy judge's judgment, order or decree or remand with instructions for further proceedings." Fed. R. Bankr. P. 8013.

## III. Standards of Review

"When reviewing a decision of the bankruptcy court [rendered in a core proceeding], a district court functions as an appellate court and applies the standards of review in federal courts of appeal." Paramount Home Ent. Inc. v. Cir. City Stores, Inc., 445 B.R. 521, 526-27 (E.D. Va. 2010) (citing In re Webb, 954 F.2d 1102, 1103-04 (5th Cir. 1992)). A district court sitting as a bankruptcy appellate court reviews "findings of fact only for clear error, but [the court] consider[s] the relevant legal questions de novo." In re Varat Enters., Inc., 81 F.3d 1310, 1314 (4th Cir. 1996). It reviews mixed questions of fact and  law de  novo. In  re  Gordon  Properties,  LLC, 516  B.R.  323,  327  (E.D.  Va.

2014) (citing <u>Canal Corp. v. Finnman</u>, 960 F.2d 396, 399 (4th Cir. 1992)).

Clear error review is a "very deferential standard of review." <u>United States v. Horton</u>, 693 F.3d 463, 474 (4th Cir. 2012). A factual finding is clearly erroneous "when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." <u>HSBC Bank USA v. F & M Bank N. Va.</u>, 246 F.3d 335, 338 (4th Cir. 2001) (quoting <u>Anderson v. Bessemer City</u>, 470 U.S. 564, 573 (1985)). For clear error review, the inquiry is not whether the reviewing court would have reached the same result if it were sitting in the trial court's shoes.

Rather, the appellate court will determine whether the trial court's "account of the evidence is plausible in light of the record viewed in its entirety." <u>United States v. Thorson</u>, 633 F.3d 312, 317 (4th Cir. 2011) (quoting <u>Anderson</u>, 470 U.S. at 573-74). If the findings of the court below are plausible, then the reviewing court may not reverse the lower court's conclusion—even if it may have weighed the evidence differently. <u>Id.</u> This remains the rule "even when the district court's findings do not rest on credibility determinations but are based instead on physical or documentary evidence or inferences from other facts." <u>Id.</u> (internal quotation omitted). Lastly, "due regard shall be given to the opportunity of the bankruptcy court to judge the credibility of the witnesses." <u>In re Gordon Properties, LLC</u>, 516 B.R. at 327.

De novo review, on the other hand, by definition, "entails consideration of an issue as if it had not been decided previously." <u>Stone v. Instrumentation Lab'y Co.</u>, 591 F.3d 239, 246 (4th Cir. 2009). De novo review allows for "a fresh independent determination of 'the matter' at stake." <u>Doe v. United States</u>, 821 F.2d 697-98 (D.C. Cir. 1987).

Essentially, de novo review results in "a new adjudication." <u>Betty B Coal Co. v. Dir., Off. of Workers' Comp. Programs, U.S. Dep't of Lab.</u>, 194 F.3d 491, 499 (4th Cir.1999).

## IV. Analysis

The Appellant presents four issues for this Court on appeal. First, the Appellant requests a determination on whether the bankruptcy court erred in finding as fact that Ms. Meador had actual knowledge of the disputed transfers from the Appellant's bank account in September 2019.[10] Second, the Appellant requests a determination on whether the bankruptcy court erred in refusing to admit into evidence the deposition transcripts of Mr. Tereshkov and Ms. Sundaram under Rule 32(a)(4)(B) of the Federal Rules of Civil Procedure. Third, the Appellant requests a determination on whether the bankruptcy court erred in admitting into evidence the Appellee's Exhibit E, an alleged transcription prepared by the Appellee of a telephone conference, and the Appellee's Exhibit K, a Trello board. Lastly, the Appellant requests a determination on whether the bankruptcy court erred in failing to apply Delaware state law and conclude that the Appellee acted in "conscious disregard" or "willful blindness" of a substantial and unjustifiable risk, which involved a gross deviation from the standard of conduct that a law-abiding person would observe in his situation, and that the Appellee failed to show the entire fairness of the transactions. The Court will review each issue in turn.

### A.  Issue 1: Ms. Meador's Knowledge of the Disputed Transfers

The Appellant appeals the bankruptcy court's finding of fact that Ms. Meador had

---

[10] The Court notes that the Appellant sometimes refers to disputed transactions occurring in September 2020 in their brief, including in the Statement of Issues Presented section and the heading of the first subsection of the Argument section of their brief. However, upon review of the Statement of the Case section of their brief, and the record as a whole, the Court is confident that the Appellant intended to refer to the disputed transfers that occurred in September 2019, as those are the only transactions that have ever been at issue in these proceedings.

14

actual knowledge of the disputed transfers that occurred in September 2019. As a finding of fact, the Court will review the bankruptcy court's determination on this issue for clear error only. In re Varat Enters., Inc., 81 F.3d at 1314. For the reasons explained below, the Court affirms the bankruptcy court's finding of fact on this issue.

Upon review of the evidence before the bankruptcy court and the testimony provided during trial, this Court finds that the bankruptcy court's finding on this matter was more than plausible. First, the evidence on the record illustrates that Ms. Meador was a sophisticated, financially literate individual, not a clueless puppet. Before partnering with the Appellee, she held multiple positions that involved reviewing financial transactions and organizational authority. While employed for an environmental foundation, Ms. Meador essentially audited grantees of the foundation, reviewing whether they used the foundation's funds appropriately. While serving as the Director of Development for Earth Rights International, Ms. Meador raised funds through grants and donations. After meeting the Appellee, Ms. Meador became President of Climate Pictures, where she organized payroll and health insurance and generally reviewed the organization's finances. Ms. Meador also oversaw Climate Pictures's online bank account, an account which would later link with the Appellant's account.

Second, Ms. Meador was critically involved in establishing the Appellant and contributing to its finances. Indeed, she opened the bank account for the Appellant and was present when the Appellee was made a signatory on the account. Upon opening the account, both Ms. Meador and the Appellee could open, close, and conduct business on the account.

Next, this Court similarly struggles to reconcile some of Ms. Meador's testimony

15

with common sense, and this Court gives due deference to the bankruptcy court's judgment on the credibility of witnesses. See In re Gordon Properties, LLC, 516 B.R. at 327. Specifically troubling to the Court is the timeline of events. Ms. Meador first deposited $20,000.00 into the account on September 6, 2019. The Appellee withdrew nearly all the funds from this first deposit on that same day; he made a small, additional deposit on September 13, 2019. Ms. Meador made her second deposit on September 16, 2019, adding another $30,000.00 to the account. By this point, two of the four disputed transfers had already occurred. This Court struggles to understand how Ms. Meador would not know about the two withdrawals when she remains actively involved in the account. Then, just days after making her second deposit, the Appellee made two more withdrawals, one for $15,000.00 and another for $15,250.00. By the end of the month, the Appellee had withdrawn $49,950.00, essentially all the funds deposited by Ms. Meador.

While the disputed transfers at issue end in September 2019, Ms. Meador kept making deposits into the account, until at least February 2020. Also in February 2020, Ms. Meador signed a convertible note, on behalf of the Appellant, from Indeco. The convertible note provided that, on the closing date, the Appellant would invest $161,500.00, with $86,500.00 being new cash, while the remaining $75,000.00 referred to cash received previously, including the $50,000.00 Ms. Meador deposited in September 2019. The note provided for repayment of the money invested with interest at the time of maturity or conversion into preferred stock in Indeco upon a qualified financing. When asked about this document at trial, Ms. Meador testified that she did not read it and only signed it because the Appellee asked her to, even though she admitted to signing the document while alone in her own home.

16

The Court finds it difficult to reconcile how someone could regularly deposit funds into a business account, invest in the business, sign off on the business's investments, and hold the highest position of leadership in the business yet know nothing about withdrawals from the business's bank account, especially when that same individual has easy access to the account just at the tip of their fingers. Further, Ms. Meador repeatedly testified to making these deposits at the request of the Appellee because he needed money.

Lastly, regarding the specific testimony of Ms. Meador that the bankruptcy court relied on in its opinion and that the parties present argument on in their briefs on appeal, this Court finds the inference made by the bankruptcy court more than plausible. During trial, Ms. Meador stated, "I was denied online access to the bank account." ECF No. 5-2 at 139. When asked about the circumstances of this discovery, Ms. Meador explained

> When we went to the bank to open the account for Truth Tellers, David also told Summer to link the three accounts, the Truth Tellers, Climate Pictures, and Indeco. And some time around the Truth Tellers' note, he changed the password. I had to, at that time I was setting up payroll and insurance for Climate Pictures and I needed to keep an eye on the balance to make sure that any debits were being covered. I could not, logging onto the account I could not see the Truth Tellers' balance or transactions.

ECF No. 5-2 at 139-40. Shortly thereafter, however, Ms. Meador testified that she previously admitted that she did have access and control of the Appellant's bank account since its formation. The Appellant's argument on this point hinges on the idea that while Ms. Meador had access and control of the account for six months, she never used that access to review the account or only ever did so in some manner where she did not happen upon the disputed transfers. Importantly, throughout this same period, Ms. Meador was, as she admitted, regularly checking the bank account of Climate Pictures,

17

an account linked to the Appellant's account.

Piecing together the threads of Ms. Meador's testimony, the bankruptcy court found that the only logical result of her statements is that she noticed a change in the electronic access to the bank account in February 2020 because she had been able to, and indeed did, electronically monitor the account before February 2020, including during the time when the disputed transfers occurred. This Court finds that inference more than plausible. Notably, upon review of the trial transcript, this Court notes that Ms. Meador failed to ever plainly say that she never reviewed the Appellant's bank account.

While her counsel asks her to "[t]ell us why you didn't access the bank account," Ms. Meador never affirmatively stated that she never accessed the account. Her response to counsel's request instead diverged into a monologue about how the Appellee professed his love for her. She also did not explain why she suddenly tried to view the account for the first time nearly six months after its formation. Ms. Meador also never elaborated as to how these transfers were concealed from her. This Court similarly finds Ms. Meador's narrative rather incredulous.

While the Appellant is correct in its argument that no direct evidence existed to prove that Ms. Meador knew of and consented to the disputed transfers, more than enough circumstantial evidence existed for the bankruptcy court to find that Ms. Meador both knew of and consented to the disputed transfers. Ms. Meador was a sophisticated professional with experience in financial transactions. At the time of the disputed transfers, she was the sole Member and President of the business. Since its formation, Ms. Meador had the ability to access, open, close, and conduct business on the account. Ms. Meador made several deposits into the account and signed off on investments in

18

other ventures on behalf of the Appellant. During trial, Ms. Meador's testimony was inconsistent, and the bankruptcy court found it less credible than the Appellee's.

Indeed, this Court further agrees with the bankruptcy court's analysis on ratification of the disputed transfers. "[R]atification by silence may be inferred when, despite obtaining full knowledge of the material facts relating to a transaction, a responsible party fails to promptly disavow the action." In re Tara Retail Grp., LLC, No. 17-BK-57, 2017 WL 1788428, at *4 (Bankr. N.D.W. Va. May 4, 2017). As explored above, this Court finds the timeline of the events at issue rather suspect. Ms. Meador was actively involved in the account throughout the month of September, when all the disputed transfers were executed. Her involvement in the account did not end then but continued through at least February 2020. Then, in February 2020, she signed a convertible note, on behalf of the Appellant, which detailed the disputed transfers on the second page of the document. During this time, Ms. Meador was the sole Member and President of the business, and she participated in the business. Yet, Ms. Meador failed to object to the disputed transfers for nearly six months, until the Appellee ended their personal relationship.

In sum, upon review, this Court is not left "with the definite and firm conviction that a mistake has been committed." HSBC Bank USA, 246 F.3d at 338. Accordingly, the bankruptcy court's finding of fact that Ms. Meador knew of the disputed transfers is affirmed.

### B. Issue 2: Excluding Mr. Tereshkov's and Ms. Sundaram's Deposition Transcripts

The Appellant appeals the bankruptcy court's exclusion of the deposition transcripts of Aparna Sundaram and Vlad Tereshkov. The Appellant argues that the bankruptcy court failed to properly apply Rule 32(a)(4)(B) of the Federal Rules of Civil

Procedure. On appeal, the Appellant argues that the witnesses were more than one hundred miles from the bankruptcy court, that it was immaterial that the bankruptcy court permitted the witnesses to testify remotely, and that the Appellee had an opportunity to cross-examine both deposed witnesses as he was present at both depositions. As a legal issue, this Court will review the bankruptcy court's decision to admit these exhibits de novo. See In re Varat Enters., Inc., 81 F.3d at 1314.

Generally, Rule 32 of the Federal Rules of Civil Procedure[11] allows a deposition to be used against a party if "the party was present or represented at the taking of the deposition or had reasonable notice of it," "it is used to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying," and "the use is allowed by Rule 32(a)(2) through (8)." Near the close of trial, the Appellant moved to admit the entire transcripts[12] of the depositions for Ms. Sundaram and Mr. Tereshkov pursuant to Rule 32(a)(4)(B), which permits a party to use a witness's deposition if the court finds "that the witness is more than 100 miles from the place of hearing or trial or is outside the United States, unless it appears that the witness's absence was procured by the party offering the deposition." Fed. R. Civ. P. 32(a)(4)(B).

During trial, the Appellant justified its motion to admit the depositions solely on the fact that the two witnesses resided more than one hundred miles from the courthouse, placing them both outside the bankruptcy court's subpoena powers. A court's power to compel is governed by Federal Rule of Civil Procedure 45.[13] Rule 45 allows a court to

---

[11] Rule 32 of the Federal Rules of Civil Procedure applies in adversary proceedings in bankruptcy cases under Rule 7032 of the Federal Rules of Bankruptcy Procedure.

[12] On appeal, the Appellant frames the issue as the court failed to allow them to admit excerpts of the depositions. However, upon review of the transcript, this Court notes that the Appellant moved to admit both transcripts in full. ECF No. 5-3 at 273.

[13] The subpoena power afforded to district courts by Rule 45 of the Federal Rules of Civil Procedure is granted to bankrupcty courts by Rule 9016 of the Federal Rules of Bankruptcy Procedure.

command a person to attend a trial if the place of trial is "within 100 miles of where the person resides, is employed, or regularly transacts business in person." Fed. R. Civ. P. 45(c)(1)(A). The Appellant did not address whether either witness worked or regularly engaged in business within one hundred miles of the courthouse when moving to admit the transcripts. The Appellant also failed to explain the relevance of admitting both transcripts in full.

Federal courts are not automatically required to admit deposition testimonies under Rule 32(a)(4)(B) just because the witness is more than one hundred miles away. See, e.g., Polys v. Trans-Colorado Airlines, Inc., 941 F.2d 1404, 1410 (10th Cir. 1991). Instead, courts may consider several other factors: the circumstances relating to the witness's absence, the surprise to opposing counsel, evidentiary rules, and the longstanding preference of federal courts to have live testimony over recorded testimony. See, e.g., id.; Napier v. Bossard, 102 F.2d 467, 469 (2d Cir. 1939); Garcia-Martinez v. City & Cnty. of Denver, 392 F.3d 1187, 1191 (10th Cir. 2004); In re Air Crash Disaster at Stapleton Intern. Airport, Denver, Colo., on Nov. 15, 1987, 720 F. Supp. 1493, 1502 (D. Colo. 1989).

On appeal, the Appellant makes an argument pertaining to relevancy of these transcripts for the first time. The Appellant argues that these transcripts are relevant because they would have undermined the Appellee's testimony, which is critical given that the bankruptcy court found the Appellee credible. Indeed, in hindsight, the bankruptcy court finding the Appellee credible was critical to the outcome of the adversary proceeding. The Appellant attempts to make a relevancy argument now that it should have made when moving to admit the transcripts. While this Court reviews this issue de novo, de novo review is not an opportunity for counsel to deploy a new trial strategy with

21

the guidance of hindsight. Cf. In re Home Comp Care, Inc., 221 B.R. 202, 205 n.1 (N.D. Ill. 1998) ("Generally, a district court acting as an appellate court in reviewing a bankruptcy case decision may consider only the evidence that was presented before the bankruptcy court and made a part of the record.").

Part of the confines of Rule 32 provide that depositions may be used "to the extent it would be admissible under the Federal Rules of Evidence if the deponent were present and testifying," which includes Federal Rules of Evidence 401 and 402 governing relevance. Like a district court, the bankruptcy court during trial is "afforded broad discretion to admit or exclude any deposition testimony by applying the rules of evidence." See Tatman v. Collins, 938 F.2d 509, 511 (4th Cir. 1991). Courts often hold that it is inappropriate to admit entire deposition transcripts. See, e.g., Fenstermacher v. Philadelphia Nat. Bank, 493 F.2d 333, 338 (3d. Cir. 1974) (affirming district court's refusal to admit deposition testimony of a party where counsel's argument in support was only "to prove my case," and the district court found this insufficient to establish relevance); In re Air Crash Disaster, 720 F. Supp. at 1502 (holding that the deposition was not properly admitted in lieu of witness testimony where relevancy and foundation for opinion testimony remained at issue and would need to be reviewed throughout the testimony and sole basis for unavailability was that witness lived outside one hundred-mile radius established by rule). Here, counsel similarly failed to provide any argument at trial establishing the relevance of the transcripts.

Lastly, and of great significance to this Court, is that the Appellant moved to permit both Mr. Tereshkov and Ms. Sundaram to testify remotely. The bankruptcy court granted this motion and made accommodations a month before trial to allow both witnesses to

attend and testify at trial via either videoconference or telephone. The guiding purpose of Rule 32 is to facilitate the convenience of witnesses and parties in trial. With improvements in technology, and the vastly increased level of comfort and use of programs like Zoom and Skype, there is a growing body of case law that supports the use of remote videoconferencing trial appearances under Federal Rule of Civil Procedure 43(a),[14] which provides trial courts with discretion to allow witnesses to testify "by contemporaneous transmission from a different location." Fed. R. Civ. P. 43(a); see, e.g., Sutphin v. Ethicon, Inc., No. 2:14-CV-01379, 2020 WL 5229448, at *2 (S.D.W. Va. Sept. 1, 2020) (allowing testimony via live videoconference and noting that testimony via live video testimony is preferable to submitting a deposition); In re RFC & ResCap Liquidating Tr. Action, 444 F. Supp. 3d 967, 970 (D. Minn. 2020) (explaining that the decision to require testimony by videoconference falls within the court's discretion and finding that "the speed and clarity of modern videoconference technology, where good cause and compelling circumstances are shown, such testimony satisfies the goals of live, in-person testimony and avoids the short-comings of deposition testimony").

Indeed, even before 2020, the legal community was trending towards increased use and acceptance of virtual appearances. The Federal Rules of Civil Procedure Advisory Committee's note to the 2013 amendment to Rule 45 states that "[w]hen an order under Rule 43(a) authorizes testimony from a remote location, the witness can be commanded to testify from any place described in Rule 45(c)(1)." Therefore, when good cause exists in compelling circumstances, a court can authorize a witness to testify via a

---

[14] Rule 43 of the Federal Rules of Civil Procedure applies in adversary proceedings in bankruptcy cases under Rule 9017 of the Federal Rules of Bankruptcy Procedure.

contemporaneous video transmission and can then compel the witness to give the testimony from a location within one hundred miles of his or her residence.

Here, the bankruptcy court received motions from both parties requesting permission to allow certain witnesses to testify remotely. A month before trial, the Appellant moved specifically to allow Mr. Tereshkov and Ms. Sundaram to testify remotely. Then, at trial, without warning or explanation, the Appellant moved to admit Mr. Tereshkov's and Ms. Sundaram's deposition transcripts in full, surprising both opposing counsel and the court.

When determining whether to admit depositions under Rule 32(a)(4)(B), courts may consider the failure of a party to make an effort to procure a witness's attendance at trial. VIIV Healthcare Co. v. Mylan Inc., No. 12-CV-1065-RGA, 2014 WL 2195082, at *1 (D. Del. May 23, 2014) (refusing to find two witnesses "unavailable" for purposes of Rule 32(a)(4)(B) just because they reside over one hundred miles from the courthouse when the plaintiff failed to explain why they could not procure them for trial or that they made any attempt at doing so). This is especially relevant when a court makes accommodations upon request of the party to allow for alternative means of attendance, as the bankruptcy court did here. The Appellant did not provide any information explaining why the accommodation that it requested and received was no longer a viable option. Indeed, a witness's voluntary absence from trial does not fit within the scope of Rule 32(a)(4)(B). Garcia-Martinez, 392 F.3d at 1191.

Due to the Appellant's lack of argument at trial explaining the relevancy of the full transcripts, whether the two witnesses also did not work or regularly engaged in business within one hundred miles of the courthouse, and why their requested accommodation to

24

appear virtually was no longer a viable option, this Court finds that the bankruptcy court did not abuse its discretion when excluding the full deposition transcripts from evidence. At trial, the Appellant failed to provide a sufficient argument justifying admitting the full deposition transcripts in lieu of virtual or remote live testimony. Accordingly, the bankruptcy court's decision to exclude these transcripts is affirmed.

### C. Issue 3: Admitting Appellee's Exhibit E and Exhibit K into Evidence

On appeal, the Appellant asserts that the bankruptcy court erred when admitting into evidence the Appellee's Exhibit E, an alleged transcription prepared by the Appellee of a Zoom meeting, and the Appellee's Exhibit K, a Trello board. The Appellant raised hearsay objections to the exhibits during trial, which the bankruptcy court overruled. The Appellant contends that the exhibits were not authenticated, were not of any sworn testimony, and were not offered pursuant to any exception to Rules 803 and 804 of the Federal Rules of Evidence. As a legal issue, this Court will review the bankruptcy court's application of the Federal Rules of Evidence "for abuse of discretion, and its interpretation of such rules de novo." In re C.R. Bard, Inc., 810 F.3d 913, 923 (4th Cir. 2016) (citing Precision Piping & Instruments, Inc. v. E.I. du Pont de Nemours & Co., 951 F.2d 613, 619 (4th Cir. 1991)). Upon review of the trial transcripts, the Court finds that the exhibits were properly admitted.

The Federal Rules of Evidence define hearsay as "a statement that: (1) the declarant does not make while testifying at the current trial or hearing; *and* (2) a party offers in evidence to prove the truth of the matter asserted in the statement." Fed. R. Evid. 801 (emphasis added). "Out-of-court statements constitute hearsay only when offered in evidence to prove the truth of the matter asserted." Anderson v. United States, 417 U.S.

211, 219 (1974). Rules 803 and 804 of the Federal Rules of Evidence detail the exceptions to the rule against hearsay.

When evaluating a statement's authenticity, the trial court's role "is to serve as gatekeeper in assessing whether the proponent has offered a satisfactory foundation from which the jury could reasonably find that the evidence is authentic." United States v. Davis, 918 F.3d 397, 402 (4th Cir. 2019) (internal quotation omitted). Further, "the burden to authenticate under Rule 901 is not high." United States v. Recio, 884 F.3d 230, 236 (4th Cir. 2018). Indeed, the trial "court must merely be able to conclude that the jury could reasonably find that the evidence is authentic, not that the jury necessarily would so find." Id. at 236-37. Thus, courts require only a prima facie showing that the "true author" is who the proponent claims it to be. Id. at 237; see also United States v. Zhu, 854 F.3d 247, 257 (4th Cir. 2017); United States v. Cornell, 780 F.3d 616, 629 (4th Cir. 2015); United States v. Hassan, 742 F.3d 104, 133 (4th Cir. 2014). The prima facie showing "may be accomplished largely by offering circumstantial evidence that the documents in question are what they purport to be." United States v. Vidacak, 553 F.3d 344, 350 (4th Cir. 2009).

During trial, the Appellee explained that he recorded the Zoom meeting and uploaded the recording to a software that automatically generates transcripts of audio files. At no point did the Appellant assert that the prepared transcript is inaccurate or fraudulent. Under the low bar for authenticity, the testimony given at trial presented an adequate prima facie showing that the transcript is indeed a transcript of the identified Zoom meeting.

Despite the Appellant's contention on appeal, neither exhibit was admitted to prove the truth of the statements in the exhibits. Beginning with the Appellee's Exhibit E, the

transcript of the Zoom meeting was not admitted for the truth of the statements made during the meeting but simply to show that a meeting took place of which the Appellant had knowledge and participated in. For example, during the meeting, the Appellee stated that Delta will buy tens of billions of dollars in offsets. The transcript was not admitted to prove that Delta planned to buy tens of billions of dollars in offsets. Instead, the transcript was admitted simply to show that Indeco was a company engaged in business and not a fraudulent company that existed in name only. Further, none of the dialogue in the transcript include statements declaring "Indeco is a legitimate company" or "Indeco is doing business."

Notably, when overruling the Appellant's objection to Exhibit E, the bankruptcy court explicitly explained to counsel, "I do want to say the exhibit is being admitted, but Mr. Campbell, I hope that you trust that the Court is aware enough of the exhibit and what it's being offered for to afford it the necessary relevance when making its opinion . . . or when deciding the outcome of the case." ECF No. 5-3 at 111. Indeed, Exhibit E was relevant to the issues in contention at trial and was admitted for a purpose other than for the truth of the matter asserted. Moreover, the Appellant had agreed to admit two pages of Exhibit E as a statement against interest.

This Court also notes that it does not find the Appellant's attempt at bargaining for admission in its brief at all persuasive. As it did when moving for reconsideration before the bankruptcy court, the Appellant again argues that the deposition transcripts of Mr. Tereshkov and Ms. Sundaram should have been admitted because Exhibit E was admitted. The Appellant then goes so far as to allege that the bankruptcy court "did not apply justice in an impartial and evenhanded manner." ECF No. 7 at 28. This Court finds

27

the Appellant's characterization of the bankruptcy court meritless and inappropriate.

Similarly, Exhibit K, which consisted of screenshots of a Trello board for Indeco, was admitted for a nonhearsay purpose. A Trello board is an online communication and organization platform. The Appellee and Ms. Meador both testified to using a Trello board for business purposes. The exhibit was admitted both as a statement against interest and to impeach Ms. Meador's testimony. Ms. Meador had previously testified that she did not know much about Indeco, but the Trello board illustrated that she had access to information about Indeco's business. At no point was there a discussion about the truth of the statements displayed on the Trello board.

Upon review of the trial transcripts, the Court finds that the exhibits were admitted for purposes other than for the truth of the matter asserted. As a result, this Court finds that the bankruptcy court properly admitted Exhibits E and K at trial. Accordingly, the bankruptcy court's decision on this matter is affirmed.

### D. Issue 4: The Bankruptcy Court's Failure to Conclude that the Appellee Acted in Conscious Disregard or with Willful Blindness and that the Appellee Failed to Show the Entire Fairness of the Transactions

The Appellant's final issue on appeal broadly and boldly asserts that the bankruptcy court failed to apply the correct legal principles its in memorandum opinion and order. Specifically, the Appellant argues that the bankruptcy court should have applied Delaware law because the Appellant is organized as a Delaware limited liability company. The Appellant argues that Delaware law places the burden on the Appellee to show that the disputed transfers were entirely fair to the Appellant. The Appellant asserts that they brought these issues to the bankruptcy court's attention in their Proposed Findings of Fact and Conclusions of Law, but the bankruptcy court ignored them.

The Appellant's argument on this issue centers around a choice of law analysis

and the presumption that a choice of law analysis applies in these proceedings. In all events, choice of law questions most often occur when a federal court is sitting in diversity jurisdiction. Generally, a choice of law issue arises when "the facts underlying a legal issue implicate multiple jurisdictions." Price v. Stryker Corp., 270 F. Supp. 3d 226, 230 (D.D.C. 2017).

In filing their complaint, the Appellant brought the adversary proceeding pursuant to 28 U.S.C. §§ 157 and 1334, seeking an order determining that the debt owed to it by the Appellee is excepted from discharge under 11 U.S.C. § 523(a)(3)[15] and 523(a)(4). Similarly, this Court has jurisdiction to hear appeals "from final judgments, orders, and decrees . . . of bankruptcy judges entered in cases and proceedings referred to the bankruptcy judges under section 157." 28 U.S.C. § 158(a). Indeed, federal courts have exclusive jurisdiction over bankruptcy cases. As bankruptcy is a form of federal question rather than diversity jurisdiction, choice of law analyses are rare. The bankruptcy court below likely did not engage in the choice of law analysis detailed by the Appellant because it is simply inapplicable to this case.

There are instances when a bankruptcy court encounters an issue where the applicable federal law incorporates matters that are the subject of state law, and the bankruptcy court must apply state law to the substantive state law questions. E.g., In re Merritt Dredging Co., Inc., 839 F.2d 203, 205 (4th Cir. 1988). This case is not one of those; there are no underlying substantive state law questions at issue. The Appellant raised one issue in their complaint in the underlying adversary proceeding: that the Appellee's liability to repay the $49,950.00 was non-dischargeable pursuant to 11 U.S.C.

---

[15] After the Appellant filed its complaint, the Appellee amended his bankruptcy schedules to include the Appellant's claims, thus rendering the § 523(a)(3) allegation moot.

§ 523(a)(3), based on the Appellee's failure to schedule the disputed transfers, and pursuant to 11 U.S.C. § 523(a)(4), based on the Appellee's alleged fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. This question raises no choice of law issues. Instead, federal bankruptcy law determines whether a debtor was acting as a fiduciary in any fact situation for purposes of finding a debt to be nondischargeable for breach of fiduciary duty. In re Janssens, 449 B.R. 42, 77 (Bankr. D. Md. 2010), aff'd sub nom. Janssens v. Freedom Med., Inc., No. CIV. JFM-10-2042, 2011 WL 1642575 (D. Md. Apr. 29, 2011).

Nevertheless, the Appellant now seeks to paint its lawsuit as a simple breach of fiduciary duty claim. If it were, then perhaps a choice of law analysis would be proper. However, the adversary proceeding initiated by the Appellant sought to answer one very specific federal question, which was whether the Appellee's debt incurred by the disputed transfers should be nondischargeable in bankruptcy because of fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny. This question is answered through the application of federal bankruptcy law, not state law.

The Appellant complains that they explored the choice of law analysis in their Proposed Findings of Fact and Conclusions of Law, but the bankruptcy court ignored it. This Court finds that the bankruptcy court properly excluded a choice of law analysis from its decision-making process; the bankruptcy court did not simply overlook an entire facet of applicable law. Instead, the bankruptcy court appropriately focused both the trial and its memorandum opinion to the relevant federal law governing defalcation and fraud while acting in a fiduciary capacity, embezzlement, or larceny. This Court will not further belabor the point by approving every step of the bankruptcy court's decision-making process or

30

all the cases cited to therein. Put simply, the claim alleged by the Appellant in its adversary complaint does not implicate any choice of law concerns, which is why the bankruptcy court did not include a choice of law analysis in its decision. Accordingly, the bankruptcy's application of its cited legal authorities is affirmed.

### V.  Conclusion

For the reasons discussed above, this Court **AFFIRMS** the Memorandum Opinion and Order of the United States Bankruptcy Court for the Northern District of West Virginia entered on March 31, 2022, docketed in 3:20-ap-36.

The Clerk of Court is **DIRECTED** to remove this action from the Court's active docket.

The Clerk is **FURTHER DIRECTED** to transmit copies of this Order to the United States Bankruptcy Court for the Northern District of West Virginia and all counsel of record herein.

**DATED**: March 20, 2023

GINA M. GROH
UNITED STATES DISTRICT JUDGE